Good morning. I'm Dean Stewart on behalf of Sean Matsunaga. In terms of timing, I'd like to try to do nine minutes, save a minute, and have Mr. King take the other five minutes. As is obvious from all of the pleadings and the briefs in this case, this was an exceptionally sensational bank robbery. It may well have been the most sensational one in the history of the state. Unfortunately, trial counsel's attempt to show that to the district court left a little bit to be desired. I hate to throw him under the bus, but there seems to have been a lot of things he could have done to establish that there was this overwhelming publicity and all of it was negative. I've got to tell you, it may be your misfortune to draw me, but I don't think I've ever heard of your clients. I lived here for 30 years. May I ask if Your Honor has heard of the case, the shooting up the Kahala Bank? I suspect at the time that there would have been news reports that there was a crime, but that's as far as it goes. And the fact that people are aware of a crime doesn't mean that the case gets sent to a different district. No, and I agree with that, and I think that's the Bayou case, 1982 case, as people can know about it, but unless they're honing in on a particular defendant. These gentlemen, however, particularly the guy that did the shooting, Mr. Batalona, he was apparently quite famous at the time, giving press conferences while he's on the run. There's this huge manhunt, and finally eight days later, he's tracked down. We get that from snippets within the briefs and snippets within the trial court. We don't have a real good record on that, and frankly, the pretrial motion on this that was submitted to the magistrate judge, if that's all there was, I would not have brought this issue. What happened, though, was once they get into the actual jury selection, we start getting the feedback from these potential jurors, particularly, and I quoted a potential juror by the name of Alfonso. He went on at some length about how he personally was frightened about all of this, and how it was that these gentlemen had shot up the neighborhood. Was he challenged? He was challenged, and I believe the challenge was overruled. Your brief tells me it turned out his mother was in the area at the time of the robbery. Right. Well, you're going to get people like that on the jury panel, but that doesn't tell you that everybody's mother was in the area of the robbery. It's pretty safe to assume that wasn't the case. Well, Your Honor, I've got to kind of take issue with that. You tell us 49 of the approximately 130 potential jurors were excused. That doesn't seem to me an exceptional number. That suggests they're being careful, but that still leaves, what, 80 potential jurors? Well, Your Honor, that's about 40% of the veneers that come in, and having tried cases in federal court for 27 years, that's a heck of a hit. I thought they were, if you have to break that down, I thought only 5 of the 100 and some were excused for negative pre-trial publicity. Yes, Your Honor, and I think that was the government's representation, and sadly, I didn't go back to actually count the people. Because there's a lot of people get excused for a lot of other, you know, reasons. Sure, but what I did do is I think in my reply, I went back through 9 folks who had talked about specifics of ways they were connected to this case. And I will say that Mr. Alfonso, the juror that I quoted, was the most spectacular one, no doubt about that. But that's what sort of keys... He didn't sit, did he? I don't believe he did. He was struck on a peremptory, as I recall. Obviously by the defense. After all was said and done, did anybody sit on the jury who had ever heard of this case? I believe there were, Your Honor, but I can't be sure. I can't be sure. So when you're talking about presumptive prejudice and actual prejudice on the venue change, what trial counsel tried to do was show presumptive prejudice, and he failed. He didn't do it, no doubt about it. The way this comes back up, I would suggest, is actual prejudice when we've got this veneer in there, and we start talking to them, and that's when we see the examples that I gave the court just a couple of moments ago. But can you establish actual prejudice if those examples are all the people that did not sit on the panel? Well, Your Honor, yes, that's true. That's true. I won't press the fact that this is not the Rewall case. Certainly the factual basis is a lot different, a lot different. I'd like to move on, if I can, to the sample gun and the flash suppressor. As the court may recall, this AR-15 that was used in court, there was no AR-15 actually recovered in the case. So this was strictly for demonstrative purposes. But there was testimony about such a gun. Yes, although I don't think it was conclusively proven beyond a shadow of a doubt that it was an AR-15, but I think the government had an expert that said it sure looked like one. Let's assume that it was absolutely conclusively proven that it was an AR-15. At that point, to bring in this sample gun and show it to the jury and it was in fire position and all of that, why in the world would the government take the chance that this is prejudicial material coming before the jury, given the rest of the proof in this case? They didn't need this thing. And yet here's this big, monstrous military-type gun, and they're flashing it around the court. It's the same thing as an M-16, isn't it? I wouldn't know, Your Honor. I've had no military service. I think it is. It would be kind of hard to describe it as big. Again, I wouldn't know. But what's the prejudice? I mean, it's true that sometimes people press too far and then you get on a peel and you wish you hadn't done that. But you have testimony that this was one of the guns that was used. There was another one as well. And they have found certain evidence in the guy's closet. What's the prejudice of a demonstration for the jury? The jury's given a limiting instruction. Sure. So tie that up because I'm just not – I'm not sure what the prejudice is. Right. Closing argument comes around defense position is they never found a gun. Maybe it's an AR-15. Maybe it isn't. Maybe Badalona had it. Maybe he didn't. Jury thinks back, ah-ha, we saw this gun. Maybe a smaller gun than I was envisioning, but a gun nonetheless. It wasn't admitted into evidence, but I think that's irrelevant. The fact that it was displayed and shown to the jury is just highly prejudicial of an aspect of the case where the defense was actually going to win that point. They were allowed to come in and basically negate that argument that, look, there was no gun found. Who had it? We don't know. It's more reasonable doubt. But this is what was found, flash suppressor. Yes. And this is what goes on. That's where I was going next, Your Honor. On that one, the testimony was the flash suppressor could be used on many guns, not just the AR-15. And as I understand it, the government's position was this connects my client to this robbery because he had something that could have been put on this gun. But that's like saying they seized some shoes in his apartment or his home and, by golly, the robbers had shoes on. So, therefore, there's the connection. No, the difference is that we saw some shoes in his closet and you had a witness who said, and the robber wore shoes of this nature. Yes. So, I mean, there's a further step here. And they looked like these shoes with purple toes. They looked like Bruno Mali's. And I agree with that. And I agree with that. The problem with that, though, is that there was no flash suppressor at the robbery. None. I mean, what was the point? This is just like the AR-15. Why did the government, who probably had the defendant figuratively on the ground at this point, kick him in the head? And that's what both of these items are. They're figurative kicks in the head and they're cumulative, the two of them. Well, then, do they matter? I mean, is there any prejudice that could result from this? Well, we don't know. We don't know that. There's no way to gauge that. Certainly, these are powerful pieces of evidence. Was the jury convinced by that point, by the time they got there, that these guys were already guilty? We don't know. What was the core defense? I wasn't the guy or something else? I had a little trouble finding that, Your Honor. I confess I did, too. And I'm really not sure how this evidence related to anything. I understand a broad argument, big guns, scary, so forth. Is there anything specific to these defendants that this could have made a difference? Yes, only in the sense that it was the piling on of the evidence at that point. If it was cumulative, it wouldn't be prejudicial. And I agree with that. The problem with that, though, is I would suggest that this isn't just cumulative. This is big stuff. This is sexy, flashy stuff that the jury just really grabbed onto. It's more than simple cumulative evidence. You're well into your co-counseling. And I apologize. I'll stand by at this point. Thank you. Harden, put 8 on the clock, will you? May I please? Can you put 8 on? I just wanted to make sure you had all your time. You're good to go. Thank you, Your Honor. Sam King, appearing for Defendant Hymie. Judge, it's certainly true that not all defendants are the same in this case. There were four, Batalona, Hymie, Daly, and Matsunaga. Daly pled out early on. Matsunaga, I mean, Batalona went to trial in state court. Hymie and Matsunaga ended up in federal court with various versions of whether they were going to plead or not plead. My client finally pled. And the judge was sympathetic to at least that fact and also sympathetic to the fact that of all the defendants who were left, and especially my client, he was probably the least culpable, especially of what he got assigned for. He was assigned with eight levels of increase, almost every one of them based on other people's conduct, not his, especially Batalona's. Now, at some point in this proceeding, I think we're going to have to have some kind of a remand under M-line 3. If you look at page 96 of the transcript, sorry, page 29 of the transcript, where the judge sentences my client, she's clearly talking about giving my client some kind of credit. She's stuck in the guidelines. She starts in the middle, and she decides. She clearly treated the guidelines as mandatory. I think she pretty much cleared that. We've been, as you know, sending these back. Right. So I think the only question might be, should you try to rule on some of these fact-specific issues right now and then send them back so she's got some guidance as to what the guideline calculation should be, or should it be remanded first to see what she's going to do, even considering these arguments that she rejected on our part? That's the very purpose of M-line, is to ask the district judge in the first instance, would you sentence differently now that you know their advisory? And if the answer to that is no, that's the end of things. If the answer is yes, then the district court is free to conduct another sentencing hearing, engage in fact-finding, et cetera. Right. So I don't want to exhaust you too much with that. I think that's probably the logical thing to do. I mean, we have, to be honest, we have cases that go both ways, some of which say, well, if the guidelines are advisory, we better at least say what they mean. Right. And then there's a ruling, and then it's remanded. And then others it's, well, we don't even know that the judge will invoke that aspect of the guideline, therefore we're not going to try to prejudge. So that's kind of the situation we're in. Do you, on behalf of your client, what are you asking us? This is the case that makes sense to me, to send the case down before you make any rulings, because she was clearly trying to give him some credit for he pled out, he was being assigned, his A-levels had increased basically for what other people did, and arguably not very predictably at that. He was the one defendant who, it was a horrible robbery, of course, but he was the one defendant who was attempting to, you know, a baby was crying, he was attempting to comfort the baby. So I think the judge would have given him a little more credit if the judge thought she could have. So it makes sense to me to remand it first, let's see what she does, and then see where we go from there. There are separate questions here, though. The guidelines in their advisory form are still supposed to be looked at by the district court, and so even if the district judge winds up saying, you know, I get to this final calculation, what was it, 212 months or whatever it was? Right, 10 years plus. That's too much for this person. I'm going to recognize that the guidelines are not mandatory any longer and sentence to something different. Right. Alternatively, you have an approach that says the calculation which was done, which included, let me just pick one, the two-level increase for the bodily injury. Bodily injury. That wasn't appropriate here, and so it would go back, and if the district judge hears that, you get a different calculation from which you can decide whether or not a departure would be appropriate. And also it seems to me that if we would say, no, that isn't appropriate, you wouldn't get simply an amyling remand. You'd get a full resentencing because we'd say that this sentence is defective. That's true. With that context, I'm trying not to have you go off on a citing that you may not want to go off on. Do you want to address the specific objections you've raised? I can, Judge. I have not much time, and this is all very fact-specific, but the one you address is certainly one that concerned us a lot. That and the tied-bound or locked-up two-level increase. The application note says it should be a significant injury. The police officer who died behind the car, I think he scraped up his left arm a little bit, was treated at the scene, and that's it. One of the people in the back was hit on the back of the head, about a quarter of an inch injury on his forehead, and that's it. And it's hard to say that that is a significant injury. I mean, that's what the application note says. It's a word that must have some meaning, more than a quarter of an inch injury on kind of a sore head. In fact, that person wasn't even treated at the scene. There's indication he went to emergency later. The other one, and as a legal matter, I cited the Farrier and Thompson cases, which don't seem to be reconcilable to me. And the guidelines say, and the application notes say, that the person should be tied-bound or locked-up. And, you know, nobody was tied-bound or locked-up. They were held at gunpoint, and to take tied-bound and locked-up, and to expand it so far to mean that merely being held at gunpoint is that, the words practically have no meaning. I mean, what about a typical bank robbery where somebody just walks up to the teller and passes them a note and says, I have a gun. Give me all your money. What does that mean? The person is restrained, tied, locked, or bound up. It's like every bank robbery has a two-level increase for being tied-level and bound-up. So to me, those are the two most serious ones. The other ones, obviously, are a concern as well, because my client had four levels added for what Bottolone did, which was completely unpredictable. So if this court does want to consider those, we certainly wouldn't object to that. But I think the judge would certainly give this case another hard look if she knew that the guidelines were not mandatory, especially because my client fled in a very difficult case. Okay. Clerk of the government at this time.  Good morning, Your Honors. Ronald Johnson, Assistant United States Attorney on behalf of the government. I'd just like to start by saying that Judge Molloy did an excellent job in this case in protecting the record from precisely what the counsel for the defendant now claims was an egregious oversight in not preventing pretrial publicity voir dire from bleeding over and tainting the panel. She, at the defense counsel's suggestion, and not appellate counsel, issued a questionnaire to all the jurors. Based upon the review of the questionnaire, counsel had an opportunity to select and call in individually any individual who they had concerns about. Counsel did, over the course of almost two days, rigorous voir dire along with the court, and I think the record shows that. In addition, the court was very careful in asking counsel whether or not he had any challenges when the panel was being passed for cause. Arden, can you start the clock? One second. She was like you. She gave you some extra time. Thank you. When the panel was being passed for cause, so there was no objection at that point once the pretrial publicity voir dire had occurred. Can you answer the question I had earlier, which is, can you tell us if any juror who said they were aware of the crime or the reports of it actually sat on the jury? Your Honor, it would be just to my recollection at this point as a trial attorney. Did you try the case? I did try the case, Your Honor, and I sat through jury selection. To my knowledge, that didn't happen, but I can say with full certainty. Some were struck for cause? Yes, Your Honor. Some survived cause but were perimetry challenged? Yes, Your Honor, but the ones that survived cause were passed by defense counsel on the issues that he had raised. So obviously the five who were removed, who clearly had some predisposition based upon news reports, were removed up front. The others which were mentioned, 49, were excused for various reasons, the normal hardship, conflicts in schedule, knowing police officers or witnesses or being related to or living in the area, things like that. Your Honor, with respect to the demonstrative aid, I seriously disagree with counsel's characterization of the weapon and the reason why it was put in. It wasn't a kick in the head. It was not unfettered action by a prosecutor to try to pile on. There was a fifth count in this case. Specifically, the count dealt with whether or not Mr. Badalona, who was a co-defendant, carried a fully automatic weapon. A fully automatic weapon under 924C carries a 30-year consecutive term. That was a very hotly contested issue to which defense counsel at trial called his own expert. There were parts found and entered into evidence which the expert testified were removed from an AR-15 or M-16 style rifle. Those parts are the same parts that would have to be removed to convert the weapon to fully automatic. Those parts which caused the weapon to be semi-automatic were removed and found at the defendant's friend's home. Flash suppressor? The flash suppressor. The sear? The sear, the trigger assembly, and some other parts that are relating to the bolt carrier and the inner workings were changed out. The purpose in bringing in the demonstrative aid were to show the relevance of the parts that were recovered. There was testimony that Badalona and some of the others talked about converting their weapons to fully automatic and, in fact, had ordered parts. Those parts that were removed and found at another location were the same parts that would have to be removed, the fully automatic parts installed to convert an AR-15, M-16 into fully automatic mode. The officer who had military training who responded, his testimony was he believed that he was being fired at fully automatically. So that was a hotly contested issue. The reason to bring in the car shorty, as the art expert described it, was to show where in the gun these parts belong and how it worked and why it would convert it to fully automatic. We were absolutely unsuccessful in persuading the jury that the gun which was not recovered was fully automatic. Count 5 was not guilty. So this couldn't have been unduly prejudicial. It couldn't have inflamed the jury to convict. Otherwise, we would have obtained a conviction on Count 5, which we didn't. What we did obtain a conviction on was Count 3, which were the AK-47 carried by Mr. Jaime, and Count 4, which was an M-16 carried by Mr. Matsunaga, which was never recovered. Mr. Matsunaga's gun and Mr. Badalona's guns were never recovered. Therefore, that style of weapon was not available to show to the jurors to explain the inner working. Badalona went to state court? Badalona went to state court. What happened? He was prosecuted and convicted of attempted murder first on a police officer by the Honolulu Prosecutor's Office, to my knowledge. So there were valid reasons to use the demonstrative aid. In addition, Exhibit 133, which was the flash suppressor, was found in Mr. Matsunaga's room, his bedroom, where he resided. That flash suppressor is specifically the type which would screw on to the end of an M-16 style rifle. Could it be used in other weapons? The expert testified, I believe, Your Honor, that his opinion was it would fit an M-16 or AR-15 style rifle. That's the extent. I'm not an expert, Your Honor. He didn't exclude other weapons? Not to my knowledge. However, other very relevant evidence about Mr. Matsunaga's possession of an M-16 also came into being and was introduced. There were three 30-round magazines which specifically fit into an AR-15 M-16  So this was not an attempt to pile on or throw in irrelevant evidence. The judge carefully considered whether or not the flash suppressor went to effect a consequence, and that was whether or not Mr. Matsunaga actually possessed an M-16 during the robbery. The fact that he had that suppressor, which fit an AR-15 M-16, made it more likely that he actually possessed that weapon. In addition, the three magazines located in his truck made it more likely that he actually possessed that type of weapon. Now, there was also direct testimony by Roger Daly, a co-defendant and cooperator, who said, in fact, Mr. Matsunaga did have an M-16. The other statement made by counsel that this was some large weapon and we don't know what the real one looked like or some question about whether or not they had seen this type of weapon. Well, they did, in fact, see this type of weapon. The jury saw it in a photo which was published to them, which was taken off the bank surveillance reel, which is a picture of one of the robbers in full dark clothing with boots, a mask, vaulting the counter where the teller space is, coming through that opening with, in fact, a car shorty, an AR-15 shortened version. That was identified by our expert and he said that's what it appeared to be. It appears to be the same style weapon that we have in court. With respect, Your Honor, to the enhancements which the defendant, well, both defendants were assessed with, it's clear that when you enter into a conspiracy with co-defendants and both of them were convicted of conspiracy to commit robbery, when you enter into a conspiracy with co-defendants, you're responsible for the actions of those co-defendants to the degree that they're foreseeable. The foreseeability issue here is the key and Pinkerton speaks best to that, where basically to find that an act is reasonably foreseeable if it is a necessary or natural consequence of the unlawful agreement. The unlawful agreement in this case, which was laid out, they went and they cased the bank. They geared up with dark clothing, boots, masks, semi-automatic and arguably fully automatic weapons. One individual at least wore body armor. They indicated in their discussions from testimony of Mr. Daly and in the PSR in Mr. Jaime's case, Mr. Daly indicates that if the police were to come, the belief is that they are going to use force to escape. As soon as that is stated, the use of deadly force by virtue of the weapons they possess is contemplated. Therefore, the discharge is contemplated, which deals with a reckless endangering. This is surely to go back on an Ammaline remand. Yes, Your Honor. Is it necessary to get into this stuff? Your Honor, only to the extent that if the court wishes to hear from the government on this, the government's position would be that it should go back on a limited remand, not on a full scope resentencing, because we believe that each one of the two level enhancements that was assigned to the defendants, and there were four, were appropriate and proper under the law for restraint, for carjacking, for bodily injury, and the fourth were all appropriate under the law. Let me ask, the carjacking bothers me, and I'll explain why, because as you appropriately lay out, you're responsible for a natural consequence of what your agreement is to go in. Well, to go in, they're going to do an armed robbery, so, you know, and of course they have to escape, but they go in with an escaped vehicle, right? And so to me, the difficulty I had is I can see where there would be bodily injury, physical restraint, reckless endangerment, all of that, but I don't know that it's predictable that one guy is going to be more or less like on the running board and fall off the truck, and therefore he has to go out and carjack something. That's kind of, it seems to me, basically saying that there's no limit to foreseeability. It's not that there's no limit to the foreseeability. In this particular case, as in United States v. Cover, which is an 11th Circuit case, they said reasonably foreseeable under Pinkerton is necessary are natural consequences of the unlawful agreement. They stole a vehicle, well, actually they stole two vehicles to make good their escape. They had someone in the bank say one time, one time. That was slang for the police are coming. So they had a code to know that the police were going to respond and they had to get out of there and they had to take whatever means were necessary to escape. They're fully armed. They're going to use force against the police. When the police arrive, there's a high probability that they're going to be separated or somehow Plan A has to go to Plan B or Plan C, and Mr. Bottolone decided to jump off the vehicle, continue firing at the officer, and the officer returned fire. Maybe that's why Mr. Bottolone ducked behind the building. Mr. Jaime and Mr. Matsunaga did not see fit to wait for him because they would have been captured. So their specific act of knowingly leaving their co-defendant behind, fully armed with a ballistic vest and a semi-automatic assault weapon in a residential community, necessitates, what do they think he's going to do? That's the question. It's not, and he's being fired upon, so the police are there already. It is totally foreseeable that he is going to use whatever means to escape, and he has a firearm. So when he jacks, as in carjacking, he jacks the bakery truck, and the older gentleman who was driving it steps out, that should be anticipated. They left him behind with no means to exit the area. The gentleman in the bakery truck actually tried to take the keys, which I found amusing. He was 70-something years old, and Mr. Bottolone took issue with that. But Mr. Bottolone was going to escape nonetheless, and COVR specifically addresses this issue. COVR, of course, is an 11th Circuit case, and we're not bound by that. And I'm just concerned about the breadth of COVR because there's really no limit to, you know, they say pretty much if you go into a bank robbery, anything's foreseeable. That's what they say. Well, Your Honor, if you go into a bank robbery with a note and pass it and say, I'd like some money, and you're not armed, that's a different scenario. You go into a bank robbery under this scenario, to draw an analogy, felony murder could apply. Let me ask you this. I'm sorry, Your Honor. Wouldn't it seem that carjacking would be, under your theory, a reasonable consequence of any robbery? Because you go in, you rob the 7-Eleven, you rob the bank, you rob whatever. Isn't there always some possibility that to escape you're going to need to jack a car, even though you have your vehicle outside? But if you do that, you should be held responsible for it. So the answer to my question is yes, that carjacking is always reasonably foreseeable when you do a robbery. Not necessarily, Your Honor, but in this particular case it is foreseeable, and the reason why I argue that to the court is because the two co-defendants who are being held responsible for the carjacking are the ones who decided to leave their man behind. They created the situation by fleeing that necessitated the carjacking. They had to know they left him behind. So if they had taken a female hostage and raped her, that would have been foreseeable? Your Honor, in cover, the carjacking, the individual was- Why don't you start by answering the question? I'm sorry, Your Honor? Would a hostage-taking and rape of a female hostage have been foreseeable? No, Your Honor, probably not in this case. Why? The reason being is because they had already stolen two cars, so they already knew that the group as a whole was willing to steal vehicles to escape. So I think the fact that they had the stolen Blazer that they escaped in, and then they had a second vehicle, which was a Cadillac, which was stolen, and that they had preplaced at a predetermined location, that indicates that the theft of an automobile or the taking of a vehicle by force is foreseeable in this particular case. Okay, I think we understand your argument. Counsel, I think you have a minute or so for rebuttal. Thank you, Your Honor. First, Your Honor, Judge Hawkins, you had asked about the flash suppressor and whether it could be used with other weapons. In my brief, I cited Reporter's Transcript 769 for the statement that the flash suppressor was not unique for use with the AR-15. I should have attributed that to somebody, and I didn't, and I apologize for that, but I believe it is in that. I think that's consistent with what government counsel said the testimony was it would work on an AR-15 or M-16. In my recollection, it was even broader than that, but in any event, that's where we are with that. In terms of what the court is going to do with this matter, I would ask the court to consider going ahead and ruling on the matters, particularly the sentencing matters, to give guidance to the district court. On behalf of Mr. Matsunaga, we've already lost these issues in the district court. Judge Mulway had discussions. It's on the record, and we're now at a meeting. So your best hope is that we might overrule the district court on one of those? Give us some solace, yes, Your Honor. That's what I'm hoping for here. Also, we're a little bit different from Mr. Jaime's case in that we do have the trial issues that he doesn't have, and it might make sense to go ahead and do the whole thing. I guess we haven't actually been formally joined in the cases, and I didn't even know Mr. Jaime had appealed until after the briefs were written, but we are in a different position. We'd ask the court to consider that, and I would submit. All right. Thank you. The case just argued to be submitted for decision. Thank all counsel for the arguments. They were very helpful.
judges: Hawkins, McKeown, Clifton